IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HUNTINGTON CHASE CONDOMINIUM ASSOCIATION, | ) ) ) No. 16 C 4877 ) ) |
| Plaintiff, | ) ) District Judge Tharp |
| v. | ) ) Magistrate Judge Schenkier |
| MID-CENTURY INSURANCE COMPANY, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Huntington Chase Condominium Association ("HCCA") sued defendant Mid-Century Insurance Co ("Mid-Century") in Illinois state court for breach of an insurance contract arising out of a property damage claim. Defendant removed the case to federal court (doc. # 1: Pet. for Remov. at 1). Before the Court is Mid-Century's Motion to Compel Production of Documents withheld on the grounds of attorney-client privilege (doc. # 28: Mot. to Comp.).

### I.

In June and July 2016, Mid-Century served Requests for Production on HCCA, and issued subpoenas to HCCA's property manager, Lieberman Management Services ("LMS"), and a roofing contractor, Barry Roofing, Inc. ("Barry Roofing") (Mot. to Comp. at 1). In response to each of these requests, HCCA, LMS and Barry Roofing produced some documents accompanied by privilege logs identifying email communications HCCA asserts are protected from production by the attorney-client privilege. Mid-Century seeks documents from each of the separate privilege logs.

---

[1] On May 25, 2016, this case was referred to this Court for proceedings related to discovery scheduling and supervision and any settlement conference (doc. # 13).

LMS' Privilege Log contains 35 emails, 33 of which are described as having been sent between Barry Roofing principal John Argento ("Mr. Argento"), and HCCA's property manager at LMS, Jim Beck ("Mr. Beck"). Each is described in the LMS Privilege Log as "Email discussing conversations with attorney" (Mot. to Comp. at 2; doc. # 28-1: Lieberman Sub. Priv. Log at 1-3). Mid-Century seeks production of those 33 emails between Mr. Argento and Mr. Beck.

The Barry Roofing Privilege Log ("BR Privilege Log") lists 56 emails, 28 of which are described as having been sent between Mr. Argento and Mr. Beck. Those 28 emails are described as "Email discussing conversations with attorney" or "Email discussing Childress Duffy fee agreement" (Mot. to Comp. at 2; doc. # 28-2: Priv. Log at 1-4). Of the remaining 28 emails, 23 are logged as having been sent between Mr. Argento and attorneys or staff of Childress Duffy, the law firm that represents HCCA in this lawsuit. Those emails are described in the BR Privilege Log as "Email conversation with Childress Duffy" (*Id.*). There are four emails on the BR Privilege Log that are described as having been sent by Mr. Argento to an individual named Spencer Rutenbar ("Mr. Rutenbar"). The last email on this log is from a Childress Duffy attorney to Mr. Rutenbar (*Id.*). Mid-Century seeks production of all 56 of the emails on the BR Privilege Log.

The last batch of materials at issue in this motion is from Barry Roofing, accompanied by a supplemental privilege log (the "Supplemental Privilege Log"). This Supplemental Privilege Log identifies five letters from Childress Duffy employees to Mr. Argento, with a "Childress Duffy Fee Agreement" enclosed with each of the letters (Mot. to Comp. at 2; doc. # 28-2: Priv. Log at 6-8). Mid-Century seeks production of the five letters and the enclosed Childress Duffy Fee Agreements.

2

In compliance with the Court's order (doc. # 27), plaintiff delivered to this Court for *in camera* review an agreed sample of 10 emails (or email chains), all of which were listed on the BR Privilege Log.[2]

## II.

As agreed by the parties, because this case is a diversity action arising out of a contractual dispute in which Illinois law governs the rules of decision, this Court must apply Illinois law to determine whether the attorney-client privilege applies to the subject documents. *See Favala v. Cumberland Engineering Co., a Division of John Brown Inc.*, 17 F.3d 987, 989 (7th Cir. 1994); Fed. R. Evid. 302. Under Illinois law, "[w]here legal advice of any kind is sought from a lawyer in his or her capacity as a lawyer, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by the client or lawyer, unless the protection is waived." *Center Partners, Ltd. v. Growth Head GP, LLC*, 981 N.E.2d 345, 355 (Ill. 2012). But "Illinois [also] adheres 'to a strong policy of encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit.'" *Center Partners*, 981 N.E.2d at 356, *quoting Waste Management, Inc. v. International Surplus Lines Ins. Co.*, 579 N.E.2d 322, 327 (Ill. 1991).

As the party claiming the privilege, plaintiff "carries the burden of presenting facts that give rise to the privilege." *Janousek v. Slotky*, 980 N.E.2d 641, 650 (Ill. App. Ct. 2012); *Favala*, 17 F.3d at 990. To establish that a document is protected by the attorney-client privilege, "the claimant must show ... that the communication originated in a confidence that it would not be disclosed, was made to an attorney acting in his legal capacity for the purpose of securing legal advice or services, and remained confidential." *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 432

---

[2] Because all of the sample e-mails came from the same batch of materials, the Bates stamp numbers all begin with "HC Barry" followed by a number. When discussing the various documents later in this opinion, the Court will refer to the documents only by their Bates numbers, without the "HC Barry" portion of the Bates stamp.

3

N.E.2d 250, 257 (Ill. 1982) (citation omitted); *Sullivan v. Alcatel-Lucent USA, Inc.*, No. 12 C 7528, 2013 WL 2637936, at *2 (N.D. Ill. June 12, 2013) (*citations omitted*) (a party claiming attorney-client privilege must show "'threshold requirements,' including: '(1) that the communication originated in a confidence that it would not be disclosed'; '[that] it was made to an attorney acting in his legal capacity for the purpose of securing legal advice or services,'; and (3) 'that [it] remained confidential'").

The Illinois Supreme Court has adopted the "control group" test to "determine which communications between employees and agents of a corporation and their legal counsel are privileged." *McChristian v. Brink*, 65 N.E.3d 428, 433 (Ill. App. Ct. 2016) *citing Consolidation Coal*, 432 N.E.2d 250. Under the control group test, "'an employee whose advisory role to top management in a particular area is such that a decision would not normally be made without his advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority, is properly within the control group.'" *McChristian*, 65 N.E.3d at 433 *quoting Consolidation Coal*, 432 N.E.2d at 258. "Thus, if an employee of the status described is consulted for the purpose of determining what legal action the corporation will pursue, his communication is protected from disclosure." *Consolidation Coal*, 432 N.E.2d at 258. The *Consolidation Coal* control group analysis "accommodates a principal/agent relationship which involves a non-employee agent working within the scope of his authority." *Caremark, Inc. v. Affiliated Computer Services, Inc.*, 192 F.R.D. 263, 267 (N.D. Ill. 2000).

However, if a control group member communicates with someone outside of the control group, the privilege is lost. *Midwesco-Paschen Joint Venture for Viking Projects v. Imo Industries, Inc.*, 638 N.E.2d 322, 329 (Ill. App. Ct. 1994) ("Distribution of otherwise privileged material to individuals outside of the control group destroys the privilege"). If a non-

control group member "communicates with someone in the control group that communication is not protected: the employee cannot shield his communication or communications to him and the control group member cannot claim the privilege because it was destroyed when it leaves the group, similar to an individual who has protected communication with counsel but loses the protection once he publishes the communication to another." *Pensler v. Fox Television Stations, Inc.*, No. 1-14-2694, 2016 WL 3350788, at *5 (Ill. App. Ct. 2016). "This is so even if the communication is with the corporate attorney." *Id. citing Midwesco-Paschen*, 638 N.E.2d at 332 (privilege did not apply to documents between attorney and non-control group consulting expert: "only members of a corporate control group may protect their communications with a corporate attorney through the attorney-client privilege").

The Court groups the emails submitted for review into three categories (with some overlap, as some emails fall into multiple categories) when considering application of the attorney-client privilege. The first category includes emails identified as running to and from Mr. Argento, Mr. Beck and/or Childress Duffy law firm employees, and described as "discussing conversations with attorney" or "conversation with Childress Duffy." The second category embraces emails sent or received by Mr. Rutenbar or other unidentified persons. The third category contains the five letters on the Supplemental Privilege Log (for which we have been given no samples) with the enclosed Childress Duffy Fee Agreements, and emails between Mr. Argento, Mr. Beck and/or Childress Duffy employees described as "discussing Childress Duffy fee agreement." We address each of these categories in turn.

A.

Defendant argues that emails falling into the first category of documents (Bates Nos. 005800, 005805-005806, 005808-005809, 005912-005913, 005924-005925, 005967-005968, 005977-005978, and 006247-006248) are not covered by the attorney client privilege because, at the threshold, Mr. Argento is not an attorney or member of plaintiff's control group. Plaintiff responds that its relationship with Mr. Argento was formalized through a written consulting agreement that provided Mr. Argento acted as plaintiff's representative during communications with defendant and that Mr. Argento thus is within plaintiff's control group.

"To prove that a non-employee agent is a member of the corporate principal's control-group, the party claiming privilege must show: 1. the non-employee agent served as an advisor to top management of the corporate client; 2. this advisory role was such that the corporate principal would not normally have made a decision without the agent's opinion or advice; and 3. the agent's opinion or advice in fact formed the basis of the final decision made by those with actual authority within the corporate principal." *Caremark*, 192 F.R.D. at 267 *citing Consolidation Coal*, 432 N.E.2d at 258. Under the *Consolidation Coal* analysis as adapted for non-employee agents, the Court finds Mr. Argento was part of plaintiff's control-group for purposes of the application of the attorney-client privilege to the discovery at issue.

*First*, Mr. Argento, as a non-employee agent, served as an advisor to plaintiff's top management. The consulting agreement between plaintiff and Mr. Argento, dated October 31, 2014, was signed by plaintiff's president and states in relevant part that plaintiff "authorize[d] and retain[ed]" Mr. Argento to "[d]etermine the availability of proceeds payable for construction services ... arising from the damage at the Property" (doc. # 28-5: HCCA Authorization of Owner/Insured). The agreement further authorizes its insurer to communicate with Mr. Argento

6

"on matters related to the damage to the Property and repair services" (*Id.*). And, in an email dated May 7, 2015, plaintiff, through LMS, emailed Childress Duffy stating "Please direct all inquiries to John Argento" (Bates No. HC Barry 005977).[3]

*Second*, it is clear from the entire agreement that plaintiff's top management would not normally have made a decision regarding the scope of available coverage or amount of repairs to be made without Mr. Argento's opinion or advice. Under the consulting agreement, Mr. Argento was to determine the availability of proceeds for the damages, was to effect repairs, and plaintiff agreed to pay Mr. Argento in an amount equal to the insurance proceeds plus any deductible that covered Mr. Argento's construction services (*Id.*)

*Third*, plaintiff relied on Mr. Argento's expertise and demanded communications by its insurer and its attorneys to go through Mr. Argento. Plaintiff, through LMS, emailed its insurer on November 13, 2014 stating "please let this email and attachment serve as [HCCA's] confirmation that we wish John Argento ... to represent [HCCA] on this hail claim" (doc. # 29-2: Nov. 13, 2014 Email).

Of course, our conclusion that Mr. Argento fell within the plaintiff's control group does not end the inquiry. We still must assess whether the communications were privileged: that is, whether the communications originated and remained in a confidence, and were for the purpose of securing legal advice or services. Janousek, 980 N.E.2d at 650. Our *in camera* review persuades us that, with a limited exception, the emails do not qualify as privileged.

The Court holds that the emails included within the email chains on many of these documents must be produced as they merely include factual discussions. This includes all emails

---

[3] This is one of the documents that plaintiff logged as privileged, and submitted for *in camera* review. We quote from the document because our review persuades us that (1) it contains no confidential information that could fall within the privilege, and (2) even were it otherwise, a person outside the control group was a recipient of it, thereby destroying any privilege that might exist.

7

on the following documents: Bates Nos. 005967; 005800; 005912; 005924-005925; and 005977-005978. This also includes the emails on the top and bottom of 005968, the emails on 005913 through the April 2, 2015 8:07 a.m. email (all other emails on these pages ultimately must be produced on other grounds as set forth below).

The attorney-client privilege is inapplicable because the emails do not provide legal advice with respect to, or discuss the legal consequences of the factual material within the emails. The transfer of insurance claim information between plaintiff and its insurer through an attorney does not transform otherwise purely factual data into legal analysis warranting privilege protections. *See Dawson v. New York Life Ins. Co.*, 901 F.Supp. 1362, 1367 (N.D. Ill. 1995) (privilege did not apply to communications between attorneys and members of client's control group concerning legal proceedings and fraud claims, reasoning attorneys were acting more as "couriers of actual information rather than legal advisers"); *Sullivan*, 2013 WL 2637936, at *5 (in breach of attorneys' fees contract action emails sent from attorney to client and forwarded to another of client's control group members were not privileged because the purpose of the originating email was not to seek legal advice, and comments by client in forwarded email were not made by an attorney and did "not contain legal advice from an attorney." The court also held chain of emails sent between control group members containing attorneys' statements were not privileged because they "do not contain legal advice").

As noted by the *Dawson* court, "common sense tells us that there is a difference between merely providing legal information and providing legal 'advice.'" *Dawson*, 901 F.Supp. at 1367. Where attorneys are "simply called upon to provide factual information" rather than consulted concerning the legal consequences of the information, such communications are not subject to the attorney-client privilege. *Id.* The emails this Court reviewed *in camera* discuss factual

8

information but do not include legal advice concerning such facts and are therefore not protected by the privilege.

On these same grounds, plaintiffs must produce all emails in the chains set forth on Bates No. 005808 starting with the email from Eric Wedgewood, a Childress Duffy lawyer, dated April 21, 2015 at 5:42 a.m. through the email on the bottom of Bates No. 005809 from Michael Childress to Mr. Argento, Mr. Rutenbar, and others dated April 2, 2015 at 8:07 a.m. (Bates Nos. 006247-006248 are duplicates of Bates Nos. 005808-005809 and therefore the Court's ruling on Bates Nos. 005808-005809 applies).

We find that only limited portions of the following emails contain privileged information that plaintiff may redact prior to production: (a) plaintiff may redact the single line of information from the emails at the top of Bates Nos. 005808 and 006247 from Mr. Argento to Eric Wedgewood, a Childress Duffy lawyer, on April 22, 2015 at 11:56 a.m.; (b) plaintiff may redact from Bates No. 005805, the email from Mr. Argento to Mr. Beck dated September 15, 2015 at 1:56 p.m., the portion of the fourth paragraph beginning with the word "since" through the end of the fifth paragraph ending with the word "fight"; and (c) plaintiff may redact the final sentence of that email found at the top of Bates No. 005806.

### B.

The second category of emails (Bates Nos. 005811-005812, 005815-005816;[4] 005913; 005809; and 006248), those for which Mr. Rutenbar was in the group of authors or recipients, must be produced because HCAA failed to demonstrate that he was a member of the control group. In its motion, Mid-Century pointed out that HCCA did not disclose Mr. Rutenbar in its disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) as an individual with discoverable information; nor did it identify him in its answers to Mid-Century's interrogatories

---

[4]These pages are listed on the Barry Privilege Log as 005915-005916.

(Mot. to Comp. at 7). In its response to the motion, HCCA did not explain who Mr. Rutenbar is or why any communications shared with him should be privileged. The sample of emails considered *in camera* contained some of those emails, and it is impossible to determine Mr. Rutenbar's relationship with HCCA from the emails themselves or from Mr. Rutenbar's email address which is "@gmail.com" as opposed to a corporate or law firm email address.

Because the party asserting the privilege must prove that the privilege exists, plaintiff was required to inform this Court why the privilege applied to communications involving Mr. Rutenbar. *See Center Partners*, 981 N.E.2d at 356 ("The basic, well-settled rule is that when a client discloses to a third-party a privileged communication, that particular communication is no longer privileged and is discoverable or admissible in litigation"); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003) ("Knowing disclosure to a third party almost invariably surrenders the [attorney-client] privilege with respect to the world at large; selective disclosure is not an option"). Plaintiff's failure of proof leaves us with no basis to treat Mr. Rutenbar as anything other than a person outside the control group, which is fatal to plaintiff's assertion of privilege.

Accordingly, all emails that include Mr. Rutenbar as a sender or a recipient must be produced. Similarly, while the privilege logs do not include all recipients of each email, any document sent to a non-attorney third-party that plaintiff has not established belongs in its control group must be disclosed. This includes the emails in the chain on Bates Nos. 005811-005812, which were logged as from Mr. Argento to Mr. Beck but which were all copied to various unknown third parties that have "@sbcglobal.net," "@gmail.com" or "@yahoo.com" email addresses, thus breaking any privilege that might otherwise have applied.

## C.

The attorney-client privilege does not apply to categorically bar discovery of the third category of materials: emails discussing HCCA's fee agreement and the fee agreements themselves. Under Illinois law, attorney retention agreements "are not covered by the attorney-client privilege unless they disclose confidential communications between the parties who have executed the agreement." *Stopka v. American Family Mut. Ins. Co., Inc.*, 816 F.Supp.2d 516, 532-533 (N.D. Ill. 2011). *See also Hill v. Metropolitan Property and Cas. Co.*, No. 1-10-1588, 2011 WL 10069435, at *3 (Ill. App. Ct. May 12, 2011) (holding legal services contracts or retainer agreements are not *per se* protected from discovery by the attorney-client privilege). The *Hill* court reasoned: "the usual contents of a retainer agreement are not the sort of communications the attorney-client privilege seeks to protect. The fact that an attorney-client relationship is created and the general information incidental to the attorney-client relationship, such as the payment of fees, simply does not amount to legal advice protected by the attorney-client privilege." *Hill*, 2011 WL 10069435, at *3.

Further, "[i]t is well-recognized that information regarding a client's fees generally is not a 'confidential communication' between an attorney and client, and thus is not protected by the attorney client privilege." *People ex rel. Ulrich v. Stukel*, 689 N.E.2d 319, 327 (Ill. App. Ct. 1997) *citing Matter of Grand Jury Proceeding, Cherney*, 898 F.2d 565, 567 (7th Cir. 1990). Emails discussing fee agreements are not covered by the privilege unless they discuss legal advice or confidential materials. *See Stopka*, 816 F.Supp.2d at 532 (in insured client's lawsuit against subcontractor's insurer, Illinois' attorney-client privilege did not apply to retention agreement between client and attorney or e-mails forwarding the agreement where "no legal advice was sought or given [in e-mails] as part of signing of fee agreement. Instead, the e-mails

11

concern mundane issues regarding agreement's execution, the availability of [the insured], and the fact that [the insured] had recently undergone a surgical procedure").

We do not exclude the possibility that confidential communications relating to legal advice may arise in connection with billing matters. *E.g., Hill*, 2011 WL 10069435, at *3 ("confidential communications relating to legal advice will naturally arise from a retainer agreement or perhaps during negotiations in the creation of the agreement"); *Sullivan*, 2013 WL 2637936, at *2 ("confidential communications relating to legal advice arising in connection with billing matters may be subject to protection"). We do not know whether that possibility matured into a reality here, as neither the fee agreement nor the withheld emails were delivered for *in camera* review. But, we reject plaintiff's broad brush assertion that all of those materials are privileged. We order HCCA to produce the logged fee agreements and emails, but will allow HCCA to redact from them specific portions that it believes would qualify for attorney client privilege protection under our ruling today.

Finally, we consider plaintiff's argument that the fee agreement and the emails may be withheld from production on the ground that they are not relevant. In support of its argument to this Court, HCCA cites a single case in which a federal district court found that the insurance company defendant's request for copies of attorney's bills from a non-party insurance company were not relevant to the coverage dispute between the plaintiff insured and defendant insurance company's coverage dispute. *See Old Second National Bank of Aurora v. Commercial Union Midwest Ins. Co.*, No. 99 C 3941, 1999 WL 1068635, at *3 (N.D. Ill. Nov. 18, 1999). In its reply, defendant did not address the relevance argument.

In making its relevance argument, plaintiff failed to state whether it raised that objection when responding to the discovery request that led plaintiff to withhold and log the fee agreement

12

and related emails. If plaintiff failed to raise that objection when responding to the discovery request, the objection is waived. *See* Fed. R. Civ. Pro. 34(b)(2) ("The party to whom the request is directed must respond in writing within 30 days" and for each item must "state with specificity the grounds for objecting to the request, including the reasons"); *Autotech Technologies Ltd. Partnership v. Automationdirect.Com, Inc.*, 236 F.R.D. 396, 398 (N.D. Ill. 2006) (under Rule 34(b), party waived objections to discovery requests by failing to timely assert objections that could have been "seasonably asserted").

Without knowing what is contained within the documents or whether such objection was made when the material was requested, this Court cannot in a vacuum determine they are not relevant for any purpose. The Court overrules plaintiff's relevancy objection, but without prejudice. Should plaintiff seek to further explain the merits of its relevancy argument, plaintiff first will have to demonstrate to the Court that they have not waived this objection by asserting it in its response to production.

## **CONCLUSION**

For the foregoing reasons, Mid-Century Insurance Company's Motion to Compel Production of Documents (doc. # 28) is granted in part and denied in part, as follows: (1) plaintiff shall produce the logged documents tendered for *in camera* review, with the exception of the portions that we have held may be redacted; and (2) we overrule plaintiff's privilege objection to the fee agreement and the associated emails, but do not foreclose plaintiff from asserting a relevance argument in connection with those documents if plaintiff is able to show that the relevance argument has not been waived.

In addition, we order plaintiff to review the remaining documents withheld from production and logged as privileged, to determine whether they should be produced in light of

the Court's ruling today. Any documents that plaintiff produces from the logs in light of this ruling will be deemed as part of the production required by this order. In the event that plaintiff continues to assert privilege as to any of the remaining documents currently being withheld, plaintiff shall serve a revised log listing those documents. The revised logs shall correct two glaring defects in the current logs: (1) they shall identify *every* person who authored or received a logged email, including persons who were copied on the email; and (2) they shall state the capacity of each such person. This kind of detail is common, and is required by this Court's standing order [found at http://www.ilnd.uscourts.gov/judge-info.aspx?EBclBxz8ceU=] and by numerous decisions in this district. *E.g., RBS Citizens, N.A. v. Husain,* 291 F.R.D. 209, 218 (N.D. Ill. 2013) ("[c]ourts in this district have required that a privilege log identify for *each* separate document . . . all recipients, along with their capacities . . .") (emphasis in original); *Acosta v. Target Corp.,* 281 F.R.D. 314, 320 (N.D. Ill. 2012) ("The party asserting privilege must, *inter alia,* clearly identify every recipient of a withheld communication"); *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989,* 133 F.R.D. 515, 522 (N.D. Ill. 1990) (overruling privilege claim where the privilege log disclosed only nine out of 33 persons to whom the document had been distributed, stating that "the very fact that [the party] did not provide [opposing] counsel and the court with an accurate distribution list provides sufficient reason to require production").

Plaintiff shall produce the sample emails submitted for *in camera* review by February 17, 2017. Plaintiff shall produce any additional documents from the logs for which it withdraws the privilege assertion in light of this ruling, and revised logs for those documents for which plaintiff continues to assert a claim of privilege, by February 17, 2017. By February 24, 2017, the parties shall meet and confer with respect to any documents that plaintiff continues to withhold,

including the fee agreement and related emails if plaintiff seeks to pursue its relevance objection.

The matter is set for a status hearing on March 1, 2017 at 9:00 a.m.

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**DATE: February 1, 2017**