**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HUNTINGTON CHASE<br>CONDOMINIUM ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CV 4877 |
| | ) | |
| MID-CENTURY INSURANCE<br>COMPANY, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On May 12, 2014, and May 20, 2014, hail storms took place in and around Elk Grove Village, Illinois. Or maybe they didn't. The plaintiff, Huntington Chase Condominium Association ("Huntington"), which operates a complex of condominium buildings, contends that these storms occurred and caused direct physical damage to its property. Its insurer, defendant Mid-Century Insurance Company ("Mid-Century"), denies that there were significant hail storms on those dates and asserts that the only substantial hail storm to hit Huntington's property between January 2010 and April 2017 occurred in April 2010, well before its policy with Huntington was in effect. After Mid-Century denied Huntington's insurance claim, Huntington filed this lawsuit accusing Mid-Century of breaching its insurance policy. Mid-Century has moved for summary judgment. In addition, each party has filed a motion to exclude the other side's expert witness on forensic meteorology. All three motions are denied. The foundational questions of whether and, if so, when a hail storm damaged the Huntington complex, as well as myriad subsidiary facts, are disputed. And though each side denigrates the other's expert, their basic methodologies—which bear significant similarities—are sufficiently reliable to let a jury weigh their merit. Resolution of these fact disputes, and the attendant battle of the experts, requires a trial.

# BACKGROUND

Huntington operates a 53-building, 336-unit condominium association that is located in Elk Grove Village. Def.'s Statement of Material Facts ("DSOF") ¶ 3, ECF No. 58. The buildings on that property were constructed in 1994 and 1995. *Id.* ¶ 4. From August 21, 2013, to August 21, 2014, that property was covered by an insurance policy issued by Mid-Century. *Id.* ¶ 5. That policy provided that Mid-Century would pay for "direct physical loss of or damage to Covered Property," subject to the terms in the agreement. Condominium Property Coverage Form 1, ECF No. 1-1. One such condition of recovery contained in the contract is that "in the event of loss or damage to Covered Property," Huntington was required to give Mid-Century "prompt notice of the loss or damage." *Id.* at 18.

According to Huntington, on May 12, 2014, and May 20, 2014, severe hail storms occurred at the property. Huntington alleges that these storms caused direct physical damage to the roofs and siding of its buildings. It appears that Huntington was first made aware of this event in August 2014, when an individual who lived at the property informed Edward Bartosch, the president of Huntington's board of directors and also a resident, that he believed the roofs and siding of the property had been damaged in a storm back in May. *See* DSOF ¶¶ 27-28; Pl.'s Statement of Additional Material Facts ¶ 17, ECF No. 64. On November 3, 2014, Huntington first notified Mid-Century that a loss had occurred, and in April 2015, it submitted a claim to Mid-Century. *See* DSOF ¶¶ 46, 48. Mid-Century denied that claim shortly thereafter. It stated that, along with Haag Engineering, it had conducted its own investigation into the alleged incident. This investigation concluded that any hail damage to the property was minimal and that, to the extent there was hail damage, it had most likely occurred in 2010, prior to the beginning of the policy period. *See* Ex. 16, ECF No. 64-17. In December 2015, Huntington submitted additional information to Mid-

Century and requested that the company reconsider the denial of its claim. DSOF ¶ 50. Mid-Century then rejected that request and reaffirmed its denial of Huntington's claim. *Id.* ¶ 51.

Huntington filed this lawsuit in April 2016 in the Circuit Court of Cook County, suing Mid-Century for breach of contract. Mid-Century removed the case to this Court, based on diversity jurisdiction.[1] Mid-Century has now moved for summary judgment. In addition, each party has filed a motion to bar the testimony of one of the other side's expert witnesses. Those three motions are all now before this Court.

## DISCUSSION

### I. Motion for Summary Judgment

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, the Court "construe[s] all facts and inferences in favor of the nonmoving party." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015).

Mid-Century has advanced two arguments as to why it is entitled to summary judgment. First, it argues that Huntington did not provide it with "prompt notice of the loss or damage," as required under the terms of the insurance policy. Second, it contends that Huntington cannot meet

---

[1] Huntington is an Illinois not-for-profit corporation with its principal place of business in Illinois. Petition for Removal ¶ 6, ECF No. 1. Mid-Century is a California corporation with its principal place of business in California. *Id.* ¶ 7. As Huntington's claim under the policy was for approximately $6.4 million, the amount in controversy easily exceeds the jurisdictional minimum. *See id.* ¶ 10.

its burden of establishing that it suffered loss or damage to its property as a result of the storms such that it is entitled to recovery under the policy.

## A.    Prompt Notice

The insurance policy at issue in this case states that "in the event of loss or damage to Covered Property," the policy holder must give Mid-Century "prompt notice of the loss or damage." The policy does not define what qualifies as "prompt notice." As both parties agree, Illinois courts interpret such provisions as requiring the insured to provide notice to the insurer "within a reasonable time." *See, e.g.*, *First Chicago Ins. Co. v. Molda*, 408 Ill. App. 3d 839, 846, 948 N.E.2d 206, 213 (2011). Illinois courts consider a variety of factors in determining whether a party has provided notice within a reasonable time. The most obvious of them is the length of time that has elapsed between the incident and the notice. Nevertheless, a "lengthy passage of time" is not a bar to coverage "provided the insured has a justifiable excuse for the delay." *Am. Country Ins. Co. v. Efficient Constr. Corp.*, 225 Ill. App. 3d 177, 181, 587 N.E.2d 1073, 1075 (1992). The key element of the notification requirement is "the appearance to a reasonable person that a claim covered by a policy may be brought against the insured." *Id.* In addition to the length of time, the other factors to be considered in the reasonableness analysis include:

> (1) the specific language of the policy's notice provisions; (2) the degree of the insured's sophistication in the world of commerce and insurance; (3) the insured's awareness that an occurrence as defined under the terms of the policy has taken place; (4) the insured's diligence and reasonable care in ascertaining whether policy coverage is available once the awareness has occurred; and (5) any prejudice to the insurance company.

*Berglind v. Paintball Bus. Ass'n*, 402 Ill. App. 3d 76, 86, 930 N.E.2d 1036, 1045 (2010). A question of what constitutes notice "within a reasonable time" is "generally a question of fact. However, when there is no controversy as to the facts, the question of what constitutes 'within a reasonable time' becomes a question of law." *Id.* at 86, 930 N.E.2d at 1044. Here, while there are

a number of factual disputes regarding the alleged storms, there are no significant disagreements about the facts relevant to the prompt-notice analysis, so it is a question of law.

In the present case, Huntington alleges that the hail storms took place on May 12, 2014, and May 20, 2014. DSOF ¶ 23. So far as the record currently reflects, it appears that none of Huntington's board members were aware that any damage may have occurred as a result of the storms until sometime in August 2014. *See id.* ¶¶ 27-28. Huntington first notified Mid-Century of the potential loss on November 3, 2014. *Id.* ¶ 46. The key question, therefore, is whether Huntington's delay in notifying Mid-Century was reasonable.

In answering this question, three of the relevant factors—the length of the delay, the language of the contract, and Huntington's awareness of the occurrence—are intimately bound up with one another. Mid-Century characterizes the delay as lasting about six months, the time that elapsed between the (alleged) storms and the notification. Huntington, in contrast, notes that it was not aware of the damage until August 2014, and provided notice a little over two months thereafter. It argues, therefore, that the delay was really only about two months—or, alternately, that the delay between May 2014 and August 2014 was reasonable given that it was not aware of the damage during this time.

Mid-Century contends that this delay was not reasonable because Huntington's duty to notify was triggered by the hail storms, not by Huntington's awareness of the damage. It writes that "[a]s Plaintiff acknowledges, the relevant factor that courts consider is the insured's knowledge and awareness of an ***occurrence***." Def.'s Reply in Supp. of Its Mot. for Summ. J. ("Reply") 6, ECF No. 68 (emphasis in original). This assertion, however, is supported only by a citation to Huntington's response brief, and Mid-Century cites no authority in support of this proposition. The sentence that it appears to refer to in Huntington's brief is a paraphrase from

*Berglind*; as noted above, the full phrase in that opinion states that courts will consider "the insured's awareness that ***an occurrence as defined under the terms of the policy*** has taken place" in evaluating whether notice took place within a reasonable time. *Berglind*, 402 Ill. App. 3d at 86, 930 N.E.2d at 1045 (emphasis added). In other words, the rule that emerges from *Berglind* is not that a policy holder is automatically obligated to inform the insurer once any event has happened. Rather, that obligation is triggered when there has been "an occurrence as defined under the terms of the policy."

In *Berglind*, the word "occurrence" itself appeared in the text of the insurance policy and was defined in that policy, as the insured was required to notify the insurer in the event of an "occurrence." *See id.* at 79-80, 930 N.E.2d at 1039. In the present case, however, the word "occurrence" does not appear in the agreement, and Huntington's obligation to notify Mid-Century instead was triggered "in the event of loss or damage." In other words, the "occurrence as defined under the terms of the policy" here is the loss or damage—not the incident that caused the loss or damage. Mid-Century does not dispute that Huntington was not aware of the potential loss or damage caused by the hail storms until it was notified in August 2014.[2] That fact strongly favors Huntington's measurement of the notification delay (approximately two months) and supports a determination that Huntington did not act unreasonably in failing to provide notice during this period. As noted above, the central element of the notification requirement is "the appearance to a reasonable person that a claim covered by a policy may be brought against the insured." *Am. Country Ins. Co.*, 225 Ill. App. 3d at 181, 587 N.E.2d at 1075. Prior to August 2014, it would not have been clear to Huntington, acting reasonably, that such a claim could have been brought.

---

[2] Mid-Century also does not appear to have pressed the argument that Huntington's failure to detect the alleged damage during the first four months after May 2014 was unreasonable or represented a lack of due diligence such that it should be precluded from recovering.

Similarly, the Court also concludes that Huntington acted reasonably and diligently in ascertaining whether policy coverage was available after August 2014. On September 16, 2014, at the first meeting of Huntington's board of directors after Bartosch was told of the potential damage, the individual who notified Bartosch made a presentation to the board. *See* Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. ("Response") 9, ECF No. 66. The board voted to retain Barry Roofing, which had long done roof-related work for Huntington, to investigate the incident. At the next board meeting, on October 21, 2014, the board reviewed the results of Barry Roofing's investigation and decided to file a claim with Mid-Century. *See id.* Huntington then formally notified Mid-Century of the loss on November 3, 2014.

Mid-Century argues that even this shorter period of delay was unreasonable because "[t]here is no indication that Plaintiff ever questioned whether it had property insurance coverage, or whether that coverage applied to hail or wind damage." Reply 7. Rather, it contends, "the only uncertainty that needed to be resolved before Plaintiff gave notice of the loss was whether Plaintiff wanted to proceed with making an insurance claim." *Id.* That is incorrect. What Huntington needed to investigate was whether "loss or damage" under the terms of the contract had actually taken place. As Huntington points out in its response brief, there is good reason to think this question required time and expertise to investigate. After all, damage to roofs is not clearly visible from the ground. *See* Response 7. Moreover, the identification of hail damage requires a level of expertise, as evidenced by the fact that both sides in this case hired third parties to conduct investigations. *See id.* at 8. It is also the case that collective bodies, such as associations like Huntington, inevitably

make decisions somewhat more slowly than individuals.[3] Under these circumstances, the delay in notification between August 2014 and November 2014 was reasonable.

There are, however, some factors in the prompt-notice analysis that point in Mid-Century's favor. The most significant is the issue of prejudice. In March 2014—two months before the alleged storms—Huntington concluded a contract with Barry Roofing to replace 12 of the 53 roofs on its property. At some point after the alleged May 2014 storms but before Mid-Century was notified of the loss in November 2014, the two parties went ahead with this contract, and those 12 roofs were replaced. While the factual record is not entirely clear, it appears that this replacement happened after Huntington became aware of the hail storms in August. As the Illinois courts have made clear, the "purpose of a notice requirement in an insurance policy is to enable the insurer to conduct a timely and thorough investigation of the insured's claim." *Kerr v. Ill. Cent. R.R. Co.*, 283 Ill. App. 3d 574, 585, 670 N.E.2d 759, 767 (1996). When the goods or property at issue are replaced, destroyed, or otherwise manipulated before the insurer has an opportunity to inspect them, the insurer has been prejudiced. *See, e.g.*, *Pittway Corp. v. Am. Motorists Ins. Co.*, 56 Ill. App. 3d 338, 346, 370 N.E.2d 1271, 1277 (1977) ("The record before us establishes substantial prejudice as a matter of law since by the time American received notice of the first loss the damaged property had been scrapped making inspection or further investigation impossible in any reasonable sense.").

Still, there is reason to question Mid-Century's claim that it was prejudiced by the replacement of these 12 roofs before it was notified of the hail storms. Mid-Century is certainly

---

[3] Beyond these points, Mid-Century's insureds would no doubt be pleased to learn that the company encourages the submission of claims without regard to whether there is a valid basis in fact supporting the claim. It would be strange, indeed, to penalize Huntington for conducting an investigation to assess whether it had a legitimate basis on which to submit a claim to its insurer; that is hardly conduct that should be criticized or that should result in a loss of coverage.

correct that it has a solid case that it is not required to pay for the cost of replacing those roofs. Those roofs were already damaged to a degree that required their replacement—or at least so Huntington had concluded—before the alleged May 2014 hail storms. Huntington can't very well claim that storms in May 2014 caused damage requiring the replacement of those 12 roofs when it had already determined that the roofs needed to be replaced in March. Having contracted to replace those roofs months before the alleged storms, Huntington seemingly must concede that the damage that required replacement of those roofs was not related to the storm: storm or no, Huntington was going to incur the costs of replacing those roofs. It would be a windfall to Huntington to charge Mid-Century for the cost of replacing roofs that were already beyond repair; the policy with Mid-Century covered "direct physical loss of or damage to Covered Property," and excluded normal wear and tear. *See* Condominium Property Coverage Form 1, 15.

If, as it seems, Mid-Century will not be on the hook for the cost of replacing those 12 roofs, then what prejudice did the replacement and the delay in notification cause to Mid-Century? The prejudice, if any, would appear to be limited to Mid-Century's lost opportunity to inspect those roofs before they were replaced. Any prejudice arising from that lost opportunity would stem only from what those roofs might have revealed ***generally*** about the storm and the damage it wrought. Inspecting those roofs, for example, might have provided additional evidence of the severity or direction of the storm. Or perhaps those roofs held the key to dating the damage accurately. As to that sort of information, however, the ***degree*** of prejudice caused by Huntington's replacement of the roofs appears small. After all, Mid-Century and the company it hired to do its initial investigation, Haag Engineering, conducted their assessment and were still able to inspect the other 41 roofs on the property. They concluded that there had been minimal hail damage on the property and that any hail damage had likely occurred prior to the 2014 storms. Nowhere did Mid-Century

or Haag suggest that the fact that 12 of the roofs had been replaced had compromised its ability to conduct a sufficient investigation. *See generally* Ex. 16, ECF No. 64-17. Mid-Century has not offered any theory as to what it could have learned from the 12 replaced roofs about the presence or absence of hail that it did not learn from the remaining 41. Thus, while Mid-Century suffered prejudice from the decision to replace the roofs, the level of prejudice is not great.

Then there is the issue of Huntington's sophistication in the worlds of commerce and insurance. As a general rule, corporate entities such as banks are "presumed to be sophisticated in the areas of commerce and insurance," *West Am. Ins. Co. v. Yorkville Nat'l Bank*, 238 Ill. 2d 177, 186, 939 N.E.2d 288, 294 (2010), whereas individuals with only a layman's knowledge of insurance matters are typically considered to be unsophisticated. *See Bhd. Mut. Ins. Co. v. Roseth*, 177 Ill. App. 3d 443, 448-50, 532 N.E.2d 354, 357-58 (1988). Lawyers are "routinely found to be sophisticated in commercial and insurance matters simply by virtue of their profession." *Sentinel Ins. Co. v. Cogan*, 202 F. Supp. 3d 831, 839 (N.D. Ill. 2016). Huntington falls toward the sophisticated end of the spectrum. While it is not, for example, a bank or an insurance company, it is still a corporate entity; it describes itself as "a not-for-profit corporation operating a condominium association." Compl. ¶ 2, ECF No. 1-1. It is governed by a board of directors whose president, Edward Bartosch, was previously a practicing lawyer. DSOF ¶¶ 24-25. Even taking into account, as Huntington points out, that Bartosch had no training in insurance and that Huntington had not submitted an insurance claim in the 10 years before this incident, *see* Response 6, Huntington must be considered to be at least reasonably sophisticated.

Like the issue of prejudice, however, Huntington's relative sophistication is not hugely important in the overall balance. Courts look at whether a party is sophisticated for the purpose of answering the larger question whether that party's delay in notification was reasonable. For

example, the fact that a party is unsophisticated may make it more reasonable for that party to delay notification when, because of its lack of sophistication, that party believes that the incident that took place is not covered by the policy. *See, e.g.*, *Roseth*, 177 Ill. App. 3d at 448-50, 532 N.E.2d at 357-58. That is not the case here. In the present case, the delay was due to the lack of knowledge that an event that might be covered by the policy had even taken place. Huntington's relative sophistication in the fields of commerce and insurance does nothing to show that it should have been aware of this event earlier, or that it should have been able to move faster to verify that a hail storm had taken place one it became alerted to the possibility.

This point is reinforced by Mid-Century's own argument that Barry Roofing was Huntington's longtime roofing contractor, and that Barry Roofing's president, John Argento, had significant experience handling insurance claims. *See* Def.'s Mem. of Law 5, ECF No. 57. As a preliminary matter, Mid-Century has failed to cite any authority for the proposition that a third party's expertise in commercial or insurance matters can be attributed to another party for the purpose of determining whether the other party is sophisticated. Just as important, however, is that even if one concludes that Barry Roofing's expertise can be imputed to Huntington, that necessarily implies that Huntington had to take the time to communicate with Barry Roofing to take advantage of Barry Roofing's expertise. This, of course, is itself a large part of the reason for the delay in notification after August 2014.

Taking all of these factors into account, and based on the summary judgment record as it exists, the Court concludes that Huntington provided notice within a reasonable time.[4] While approximately six months passed between the incident and the notification, on this record it is

---

[4] This does not prevent Mid-Century from reasserting its argument that notice was not provided within a reasonable time at trial if it can adduce additional admissible evidence that would support such a claim.

entirely reasonable that Huntington did not notify Mid-Century for the first four months, when it is uncontested that Huntington did not know of the potential damage. And once it learned of the potential damage, Huntington acted promptly to engage a third-party investigator, Barry Roofing, and made its decision within a reasonable time upon review of Barry Roofing's report. On the other side of the ledger, to the extent that Mid-Century was prejudiced by Huntington's decision to go ahead with its previously agreed-upon replacement of 12 of the roofs, that prejudice was minimal. In addition, Huntington was at least a somewhat sophisticated party, but that factor also has minimal relevance in the specific context of this case. As a result, at this stage the Court concludes that the notice was reasonable, and so the "prompt notice" condition in the contract was satisfied.

###### B.    Proof of Damage

Mid-Century's second argument in favor of summary judgment is that there is not a genuine issue of material fact as to whether Huntington has met its burden of proof to show that the May 2014 storms were the cause of damage to its property. The policy at issue is an example of what is known as an "all-risk" insurance policy, which means that the policy covers all risks or perils except for those that are specifically excluded under the terms of the contract. Under the contract, Mid-Century agreed to pay for "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." Condominium Property Coverage Form 1. "Covered Causes of Loss," in turn, means "Risks of Direct Physical Loss" unless the loss is subject to an enumerated exclusion or limitation. *Id.* at 3; *see also* Pl.'s Statement of Additional Material Facts ¶ 8 (confirming this understanding of the contract); Def.'s Resp. to Pl.'s Statement of Additional Material Facts ¶ 8, ECF No. 69 (same).

Under Illinois law, to withstand a motion for summary judgment, a plaintiff in a lawsuit involving an insurer's failure to pay a claim on an "all-risk" policy bears the initial burden of

presenting facts sufficient to establish a *prima facie* case. The plaintiff must show (1) that a loss occurred, (2) that the loss resulted from a fortuitous event, and (3) that the policy was in effect at the time of the loss. *Gulino v. Econ. Fire & Cas. Co.*, 2012 IL App (1st) 102429 ¶ 16, 971 N.E.2d 522, 527. A "fortuitous event" is an event that, as far as the parties are aware, is dependent on chance. *See Johnson Press of America, Inc. v. Northern Ins. Co. of N.Y.*, 339 Ill. App. 3d 864, 872, 791 N.E.2d 1291, 1298 (2003). If the plaintiff establishes a *prima facie* case, the burden then shifts to the insurer "to affirmatively demonstrate that the loss resulted from a peril expressly excluded from coverage." *Gulino*, 2012 IL App (1st) 102429 ¶ 16, 971 N.E.2d at 527. In addition, the plaintiff is also required to "prove the nature, extent or amount of their loss to a reasonable degree of certainty." *Harbor House Condo. Ass'n v. Mass. Bay. Ins. Co.*, 915 F.2d 316, 318 (7th Cir. 1990).

In the present case, there is no question that a hail storm would qualify as a fortuitous event. There is also no dispute that the policy was in place during May 2014. The only open question, therefore, is whether Huntington has created a genuine issue of material fact as to whether a loss occurred and whether it resulted from the hail storms in May 2014. Again, the issue of whether the loss resulted from the hail storms is somewhat intertwined with the question whether Mid-Century can demonstrate that the loss resulted from an excluded cause. Mid-Century argues that it "can point to unrebutted evidence" that other causes such as "hail or wind outside the policy period or wear and tear, deterioration, or faulty workmanship" may be responsible for some or all of Huntington's damages. Def.'s Mem. of Law 10.

Huntington's evidence that it suffered a loss and that the May 2014 storms were the cause of that loss comes primarily from a series of expert reports. The first was produced by MetLoop Precision Weather Technologies ("MetLoop"); it was written by Nance Koslik, and reviewed and

quality controlled by Rocco Calaci, who is an expert witness for Huntington.[5] The MetLoop report concluded that on May 12, 2014, a severe thunderstorm passed over Huntington's property, and hail of up to 2 inches in diameter fell on the property. *See* Ex. 2 at 20, ECF No. 52-2. Similarly, it determined that on May 20, 2014, two more hail storms passed over the same area, and hail of up to 1.25 inches in diameter fell on the property during each. *Id.*

The second report was completed by Martin Shields, an engineer and principal at Shields Engineering Group, Inc. Shields conducted a roofing and exterior siding inspection at the Huntington property. This involved a visual inspection of all of the buildings on the property and a physical inspection of 22 of the buildings. *See* Pl.'s Statement of Additional Material Facts ¶ 38. Shields marked test squares of 10 feet by 10 feet on 17 of these buildings and found an average of between 6 and 8.7 hail impacts per test square, depending on the direction of the slope of each roof. *See* Ex. 22 at 2, 6, ECF No. 64-23. Shields also reported finding hail-related impact dents on the aluminum siding on all sides of all of the buildings he inspected. *See id.* at 9. Based on these observations, and extrapolating based on the physical proximity of all of the buildings on the property, Shields concluded that "[a]s a result of the subject 2014 storm(s), hail damaged the exteriors of the roofs, appurtenances, and siding of the named buildings in the complex," and recommended full replacement of the roofs and siding on the property. *Id.* at 11.[6]

To summarize, Huntington has presented evidence that hail storms took place in May 2014 and that these storms caused damage to the roofs and siding of its buildings. This is sufficient to establish a *prima facie* case on the issue of whether the loss resulted from a fortuitous event. *Harbor House Condo. Ass'n v. Mass. Bay. Ins. Co.*, 703 F. Supp. 1313 (N.D. Ill. 1988), *aff'd*, 915

---

[5] Mid-Century has moved to bar Calaci's testimony as unreliable. The Court addresses, and denies, that motion *infra* at 22-25.

[6] Mid-Century has not challenged the admissibility of Shields' testimony under Rule 702.

F.2d 316 (7th Cir. 1990), which Mid-Century relies on, is not to the contrary. That case involved alleged freezing damage to the pipes in a condominium association that contained 278 units. The plaintiffs were only able to locate pipe damage in 23 of those units. The *Harbor House* court determined that this was insufficient evidence to allow a jury to conclude that a fortuitous event had damaged the rest of the system. *See id.* at 1318. It wrote that "the fact that freezing caused damage to a portion of the heating System is probative of the cause of damage to the entire System only if the record evidence indicates that the damaged portion is representative of the entire heating System." *Id.* In the present case, however, there is good reason to believe that the buildings chosen were in fact representative of the entire system. None of the information in the record put forward by either side indicates that the storm passed over only a fraction of the property. In other words, in this case, all of the buildings are representative of the entire system; there is no reason to believe that any building was not similarly situated from any other with respect to the hail storms. Nor has Mid-Century demonstrated that the sampling and extrapolation methods employed in Shields's report fall short as a measure of standard professional practice. For this reason, the present case is distinguishable from *Harbor House*.

The burden, then, shifts to Mid-Century "to affirmatively demonstrate that the loss resulted from a peril expressly excluded from coverage." *Gulino*, 2012 IL App (1st) 102429 ¶ 16, 971 N.E.2d at 527. Mid-Century has argued that some or all of the damage may have resulted from non-covered causes. For example, Mid-Century's meteorological expert, Jason Webster, concluded that a previous hail storm took place in April 2010—before the policy period began— that dropped hail of up to 1.75 inches in diameter on the property, and that no hail greater than 0.75 inches fell there on the dates in question in May 2014. *See* Expert Report of Jason D. Webster 41, ECF No. 53-1. Huntington responds, however, that various reports after 2010—including an

underwriting survey conducted by Mid-Century itself in July 2013—did not identify any wind or

hail damage or other depreciation in the quality of the roofs, and specifically left a box identifying

"Windstorm/Hail" damage unchecked. *See* Response 15; Loss Control Survey 6, ECF No. 64-5.

This case thus presents a single, central factual dispute—whether the May 2014 storms

were the cause of the damage to Huntington's property—along with a series of other, related

factual disagreements (such as whether a hail storm in 2010, or some other cause, could have

contributed to the damage). These fact disputes can only be resolved at trial. Mid-Century's other

arguments—for example, that Huntington has failed to identify any witnesses to the alleged hail

storms, *see* Reply 11—are relevant to those factual issues and speak to the weight of the evidence

to be assessed at trial. They are not, however, sufficient to establish that Mid-Century is entitled

to judgment as a matter of law. Based on the entirety of the record, and construing all disputed

facts and making all reasonable inferences in Huntington's favor, the Court concludes that a jury

could reasonably determine that Huntington's presentation of evidence is sufficient to demonstrate

that the May 2014 hail storms were the cause of the damage to its property. Similarly, a jury could

reasonably conclude that Mid-Century's arguments regarding the other potential causes of damage

are not persuasive, leaving the May 2014 hail storms as the only or primary cause. Because a jury

could fairly reject Mid-Century's contention that other causes led to the damage, Huntington need

not "provide evidence allowing a jury to segregate covered from non-covered losses," Def.'s Mem.

of Law 10, as Mid-Century contends. As a result, it has also met its burden to establish its damages

to a reasonable degree of certainty.[7] It will, of course, bear the burden of ultimately proving those

_____

[7] Mid-Century also raises the issue of the 12 roofs that Huntington replaced before it notified Mid-Century of the potential damage. While this may affect the ultimate value of the damages to be assessed, it does not provide a reason to grant summary judgment. First, the fact that Huntington replaced the 12 roofs is not a valid reason for Mid-Century to have denied the entire claim. Even though Mid-Century could have appropriately denied the claim with respect to

damages at trial, but it has done enough at this stage in the process. Accordingly, Mid-Century's motion for summary judgment is denied.

## II. *Daubert* Motions

The question of when expert testimony is admissible is governed by Fed. R. Evid. 702. The modern version of Rule 702 was amended in large part due to the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and reads as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the Seventh Circuit has written, the framework established by Rule 702 and *Daubert* demands a three-step analysis. It requires that "the witness must be qualified as an expert by knowledge, skill, experience, training, or education, the expert's reasoning or methodology underlying the testimony must be scientifically reliable, and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citations and internal quotation marks omitted).

In the present case, each party has filed one *Daubert* motion to bar the testimony of an expert proffered by the other side. Huntington has moved to exclude the testimony of Mid-

_____

those roofs for the reasons discussed *supra* at 8-9, there is still a genuine dispute of material fact as to whether Mid-Century breached the contract by denying the claim in full. Second, with respect to damages, even without those 12 roofs accounted for, Huntington has still provided an adequate basis for the calculation of its damages—namely, the value of the remaining 41 roofs, along with the value of the siding.

Century's meteorology expert, Jason Webster, while Mid-Century has moved to exclude the testimony of one of Huntington's experts, Rocco Calaci. Both Webster and Calaci are meteorologists who have completed reports regarding the alleged hail storms that took place in May 2014. In both cases, it is uncontested that the respective experts' testimony would assist the trier of fact to determine a fact in issue: namely, whether hail fell on the dates at issue and whether it could have caused damage to Huntington's property. The disputes between the parties revolve around the first two prongs of the *Daubert* analysis.

### A. Motion to Exclude Jason Webster

Huntington's motion challenges both Webster's qualifications and the scientific reliability of the methods he has utilized. With respect to Webster's qualifications, Huntington's chief argument is that while Webster may be qualified to be a meteorologist in general, he is not qualified to conduct the specific type of analysis at issue in this case. Both Webster's and Calaci's reports involve the use of forensic meteorology; that is, the application of science to reconstruct a past event and determine what the weather conditions were like at a previous point in time. *See* Mot. to Bar Expert Opinions of Jason Webster 5, ECF No. 53; Def.'s Mot. to Exclude Rocco Calaci 4-5, ECF No. 52. For both reports, a primary source of data is the Next Generation Weather Radar (NEXRAD), a radar utility operated by the National Weather Service. *See* Mot. to Bar Expert Opinions of Jason Webster 2 n.1.

Webster obtained a B.S. in Atmospheric Studies from Creighton University in 2008 and a Ph.D. in Meteorology from the University of Reading in 2014. *Id.* at 5. He is the founder and sole employee of AtmoSci, LLC, a meteorology consulting firm that he established in 2009. *Id.* at 6; Def.'s Resp. to Pl.'s Mot. to Bar Dr. Jason Webster 2, ECF No. 61. Huntington contends, however, that Webster "lacks the qualifications and experience necessary to provide reliable opinions on forensic meteorology radar analysis utilizing NEXRAD data." Mot. to Bar Expert Opinions of

Jason Webster 6. It asserts that Webster has limited academic experience in forensic meteorology and little practical experience with the use of NEXRAD data. *See id.* at 5-6.

As a general matter, however, while experts' lack of specialization in a specific subfield or technology may affect the ***weight*** of the opinions they express, it does not preclude the ***admissibility*** of those opinions. *See, e.g.*, *Schuring v. Cottrell, Inc.*, 244 F. Supp. 3d 721, 729 (N.D. Ill. 2017); *Lott v. ITW Food Equip. Grp. LLC*, No. 10-cv-1686, 2013 WL 3728581, at *19 (N.D. Ill. July 15, 2013); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1113 (N.D. Ill. 2005). A court "should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

A "person who holds a graduate degree typically qualifies as an expert in his or her field." *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 11 (D.D.C. 2011). As noted above, Webster possesses a Ph.D. in Meteorology, and Huntington does not contest that he is qualified as a meteorologist more generally. The issues Huntington raises regarding Webster's alleged lack of experience with NEXRAD data may affect the weight that his opinions should be given at trial, but they do not preclude their admissibility. The Court also observes that Webster has completed roughly 15 to 20 expert reports for clients regarding forensic meteorology, of which he estimates that the majority involved hail storms. *See* Dep. of Jason Webster 44:11–45:1, ECF No. 53-2. Accordingly, the Court concludes, based on the full range of Webster's academic and professional experience, that he is qualified to render the opinions discussed in his report and testify regarding the subjects at issue in this case.

Huntington also challenges the methods Webster employed in composing his 40-plus page report. The Supreme Court has held that courts may bar testimony when there is "simply too great

an analytical gap between the data and the opinion proffered," and that courts are not required to admit "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). That is essentially what Huntington accuses Webster of doing. Webster has expressed two primary opinions: first, that hail between 1 inch and 1.75 inches fell at the Huntington property in April 2010, and second, that no hail larger than 0.75 inches fell on the dates in question in May 2014. *See* Expert Report of Jason D. Webster 41. According to Huntington, these opinions are not scientifically reliable because Webster failed to clearly explain what the methodology he used in writing the report actually was. In other words, Webster "was unable to adequately explain how he came to the conclusions he did and why his methodology was acceptable in this field." Mot. to Bar Expert Opinions of Jason Webster 8.

Huntington's argument is entirely unconvincing. As Mid-Century argues in its response brief, Webster's methodology was sound and is generally accepted within the meteorological community. Indeed, Webster's methodology was similar to that employed by Huntington's expert, Calaci (though Webster opined that Calaci's methodology was nevertheless flawed), and drew on a number of the same data sources. Webster's report and the response brief both state that his analysis was guided by Federal Meteorological Handbook No. 11 ("FMH-11"), which is published by the Office of the Federal Coordinator for Meteorological Services and Supporting Research. The stated purpose of the handbooks in this series is to provide "standards and procedures to facilitate the efficient collection, sharing, and use of meteorological information by agencies of the federal government and private industry." Office of the Federal Coordinator for Meteorological Services and Supporting Research, *Federal Meteorological Handbook No. 11: Part A: System Concepts, Responsibilities, and Procedures* 1 (January 2016), http://www.ofcm.gov/publications/fmh/FMH11/2016FMH11PTA.pdf. As the response brief

explains, Webster drew on preliminary storm reports and other sources to identify potential hail events. Once a potential hail event was identified, Webster reviewed NEXRAD radar data from sites in the area of Huntington's property to understand the characteristics of the storm cell, as well as various "products" created from that data. In analyzing the weather conditions on May 12, 2014, for example, Webster analyzed the measures for Composite Reflectivity, Base Reflectivity, Differential Reflectivity, Correlation Coefficient, and Differential Phase. *See* Def.'s Resp. to Pl.'s Mot. to Bar Dr. Jason Webster 7-8; Expert Report of Jason D. Webster 28-30. These metrics, according to Webster, did not support the conclusion that large hail fell on the property on that date.

Huntington's reply brief inexplicably ignores most of this. It does not contest that the products described in FMH-11 and in the previous paragraph are appropriate ones to consider in conducting a forensic meteorological analysis. Nor does it argue that Webster's report failed to actually draw on these sources. Nor has it pinpointed any particular steps that Webster **should have** taken in conducting his analysis but did not. Instead, it simply reasserts its argument that Webster's methodology was unacceptably vague. The Court rejects this conclusion. FMH-11 is self-evidently a scientifically reliable source, and Webster's report adequately explains how he drew on the inputs described in the handbook to reach his conclusions.

Finally, Huntington notes that Webster did not actually reach a definite conclusion about whether hail fell on the property on the dates at issue, and instead determined only that there was no hail above 0.75 inches in diameter. To the extent that this is intended as an argument against the reliability of Webster's testimony, it must also be rejected. As the Supreme Court made clear in *Daubert*, the focus of the inquiry mandated by Rule 702 "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Courts are

directed to consider the error ***rates*** of particular scientific techniques. *See id.* at 594. But this is quite distinct from considering the margins of error in a purported expert's ultimate conclusions. The fact that Webster's conclusions rule out certain outcomes (*e.g.*, hail above 0.75 inches in diameter) without definitively stating whether hail below that diameter fell is not an argument against the scientific reliability of his methods. Huntington's motion to bar Webster's testimony is therefore denied.

### B.     Motion to Exclude Rocco Calaci

On the other side, Mid-Century's motion to exclude Huntington's expert, Rocco Calaci, focuses solely on the reliability of Calaci's methods. Calaci has more than twenty years' experience in the field of forensic meteorology and has provided sworn expert testimony on more than fifty occasions. Huntington Chase's Opp. to Def.'s Mot. to Exclude Rocco Calaci 2, 4, ECF No. 62. Mid-Century has not alleged that Calaci is not qualified to testify on the subject, nor would it have been likely to succeed if it had. Rather, it has challenged the methods that Calaci used in this particular report as unreliable.

Calaci has opined that on May 12, 2014, a severe thunderstorm passed directly over the Huntington property from 6:20 p.m. to 6:30 p.m. and that during this storm, hail up to 2 inches in diameter fell onto the property. Calaci also opines that on May 20, 2014, two severe thunderstorms passed over the property, one from 9:45 p.m. to 10:10 p.m. and the second from 11:00 p.m. to 11:40 p.m., each producing hail of up to 1.25 inches in diameter that fell on the properties.

Calaci's report explaining the methodology he employed in reaching these opinions is similar to Webster's in structure, approach, and scope. His report also provides a forensic meteorological investigation into the events of May 2014 at the Huntington property. Like Webster, Calaci obtained and analyzed information from a variety of sources, including NEXRAD. *See* Ex. 2 at 2, ECF No. 52-2. Calaci, too, references FMH-11 multiple times in his report as a

guide for how certain measures should be interpreted. *See id.* at 4, 10. In addition, some of the same metrics are analyzed in both reports.

Mid-Century's central argument against Calaci is similar to one of the arguments that Huntington made against Webster. That is, Mid-Century also refers to the Supreme Court's instruction that courts should be cautious of expert testimony where there is "simply too great an analytical gap between the data and the opinion proffered" or when opinion evidence is "connected to existing data only by the *ipse dixit* of the expert." Def.'s Mot. to Exclude Rocco Calaci 3 (quoting *Joiner*, 522 U.S. at 146). It contends that Calaci's testimony falls under this category. In particular, Mid-Century focuses on one specific alleged gap in Calaci's report. The report concluded that on May 12, 2014, hail of up to 2 inches in diameter fell on the Huntington property, and that hail of up to 1.25 inches in diameter fell there on May 20, 2014. Mid-Century points out that the sources of information that Calaci was drawing on all showed the probability of hail aloft. *See id.* at 13. It argues that the report provides no basis to explain how the probability of hail of a certain size aloft translates to a certain likeliness that hail of the same size fell to the surface. *Id.* at 15. Huntington, in turn, responds that this simply represents the omission of basic meteorological principles: namely, that falling hail melts more slowly going through cold air (as was present here) and that it melts at a reliable rate. *See* Huntington Chase's Opp. to Def.'s Mot. to Exclude Rocco Calaci 12.

Mid-Century's argument concerning Calaci's opinion that the thunderstorms in question produced hail fall well short of demonstrating that Calaci's methodology was unreliable. Calaci, in short, used a variety of models and data sources that are all conceded to be relevant to an inquiry about the occurrence of hail at a particular location and time. As noted above, the type of analysis that Calaci and Webster did in their respective reports is essentially the same: they both conducted

forensic meteorological reconstructions of past events, based on NEXRAD data and other sources. It is not seriously contested either that Calaci is qualified as an expert or that the general approach that he and Webster have both followed is scientifically reliable.

Mid-Century's argument has more force in the context of Calaci's estimates of the size of the hail that reached ground level during these storms. While his report adequately demonstrates the basis for his estimates of the size of the hail produced aloft, it supplies little explanation of how he determined the size of hail hitting the ground. His deposition testimony provides further clarification on this point, *see* Dep. of Rocco Calaci 117:14–119:7, ECF No. 52-1,[8] but it bears noting that in any event Calaci's report stops short of stating that hail of any specific size hit the property. What Calaci says in his report is that hail "up to" 2 inches in diameter hit the property. In other words, as he clarified in his deposition, that is the maximum size of any hail that hit the property. *Id*. at 36:23-24. While it is a fair reading of Calaci's testimony that he takes the view that some hail of that size hit the property, his opinion does not purport to otherwise quantify the range of size of hail hitting the property or the concentrations along the range of sizes that hit the

---

[8] Mid-Century's argument about the relationship between Calaci's report and his deposition testimony is not well-taken. It is true, as Mid-Century points out, that "Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). But an expert report need not cover every detail of what an expert might say in his or her forthcoming testimony. The purpose of an expert report "is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009). The principal case that Mid-Century cites on this point, *Ciomber*, dealt with an extreme situation where the expert report was "undeveloped" and "woefully deficient, and any argument to the contrary would have been frivolous." *Ciomber*, 527 F.3d at 641. The exclusion of the expert's subsequent deposition testimony was appropriate because "the expert clearly deviated from the established scope of his expected opinion." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (describing *Ciomber*). That is not the case here. Calaci's deposition testimony does not introduce new opinions or issues that are not fairly within the scope of his report. Nor is the report so "undeveloped" that it would have failed to provide notice of the subject or content of his testimony.

property. To some degree, then, Mid-Century is indicting Calaci for failing to explain the basis of an opinion he didn't offer.

More generally, what Mid-Century is objecting to is a specific analytical move that Calaci made in the process of following a generally acceptable method. While there may be somewhat of an "analytical gap" present, it is not so "great" as to merit Calaci's exclusion. To the extent that this criticism goes to the strength of Calaci's conclusions, a judge "should permit the jury to weigh the strength of the expert's conclusions, provided such shortcomings are within the realm of a lay juror's understanding." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). The issue of whether and to what degree Calaci's extrapolation from the probability of hail aloft to the probability of hail at ground level diminishes the soundness of his conclusions is well within a jury's capacity to assess. In this context, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Mid-Century's motion to exclude Calaci is accordingly denied.

\* \* \*

For the reasons stated above, Mid-Century's motion for summary judgment, Mid-Century's *Daubert* motion, and Huntington's *Daubert* motion are all denied. A status hearing is set for April 17, 2019, at 9:00 a.m.

Dated: March 29, 2019

John J. Tharp, Jr.
United States District Judge